UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

                                                    \*

MURAD Y. AMEEN                          \*

                                                  \*

   vs.                             \* No.1:12-cv-365-LM

                                         \*

AMPHENOL PRINTED CIRCUITS, INC. \*

                                         \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION of PAUL CONNORS,

Deposition taken at Upton & Hatfield,

10 Centre Street, Concord, New Hampshire,

on Monday, June 10, 2013, commencing

at 2:15 p.m.

Court Reporter:

Pamela Carle, LCR, RPR, CRR

New Hampshire LCR No. 98

```
 1    speaking to you about what the day you decided to
 2    volunteer what you heard about Mr. --
 3         A.    Production.
 4         Q.    He came to talk to you about
 5    production?
 6         A.    Yeah.  Whenever he's in and around the
 7    area he'll stop in and say how things going, any
 8    machine issues, because I run 20 machines in there.
 9    So he'll ask if everything's running fine, how are
10    things going, are the hot jobs being addressed,
11    that thing -- that type of nature.
12         Q.    And again, sir, just so that I can
13    understand, tell me what it was that caused you to
14    volunteer this information about Mr. Ameen that
15    you weren't being asked about?
16              MS. BROWN:  Objection.
17         A.    What brought me to say something?
18   BY MS. BURNS:
19         Q.    What caused you to volunteer --
20         A.    Because cheating on your timecard is
21    not permissible in any company.  That's work
22    ethics.  I have the work ethics.  I wouldn't cheat
23    on my time, and I don't expect other people to do
```

1   that.  It's stealing.
2       Q.      Now, Mr. Pratt had his deposition taken
3   in this case, and he testified that he had been
4   down in the drill department talking to you about
5   the need to staff the department and working
6   overtime to hit the company's commitments.
7       A.      I don't recall that.  I remember him
8   coming in and talking to me about production, but I
9   don't recall the specifics of that conversation.
10      Q.      Okay, but I take it you don't have any
11  reason to take issue with the testimony that
12  Mr. Pratt has given under oath if he remembers
13  that he was down in the drill department talking
14  to you about the need to staff the department and
15  working overtime to hit the company's commitments?
16      A.      Okay.  I agree that he might have been
17  talking about overtime to make the company's
18  commitments.
19      Q.      Okay.
20      A.      I don't remember, it's a year ago.
21      Q.      And Mr. Pratt testified that you seemed
22  a little frustrated about people working within
23  the department not being there, and the need for

1    leaders?

2         A.     All group leaders had to work together.

3         Q.     Well, did you work well together

4    with --

5         A.     I didn't have a problem.

6         Q.     -- Mr. Ameen?

7         A.     Yes, I felt I did.  I had no problem

8    with Mr. Ameen, or Murad.  I'm not used to calling

9    him Mr. Ameen.

10        Q.     Did anyone ever suggest to you that

11   Mr. Ameen was declining overtime in the spring and

12   into June of 2012?

13               MS. BROWN:  Objection.

14        A.     No, not really.  I noticed he wasn't

15   working, but that's none of my business.

16   BY MS. BURNS:

17        Q.     And what did you notice about the fact

18   that Mr. Ameen wasn't working overtime?

19        A.     What did I notice?  That he wasn't

20   there.  Because I worked Saturdays.  If Murad's not

21   working -- I would run into him if he was working,

22   is what I'm getting at.

23        Q.     So when you were working Saturdays into

1       A.      I would assume so.

2       Q.      And how much more overtime was it than
3  usual did you have to work during that period of
4  time because they asked you because Mr. Ameen was
5  out with his new baby?

6          MS. BROWN:  Objection.

7       A.      I generally don't work over eight hours
8  a day.  But it was probably, I'd say, maybe two,
9  three times a week that I'd stay until 5:30.  And
10 it wasn't an exorbitant amount of time, maybe two
11 or three weeks.  And, again, I did not have to
12 stay.  It was totally up to me.

13 BY MS. BURNS:

14      Q.      But two to three times a week you were
15 working -- instead of working until three you were
16 working until 5:30?

17      A.      Instead of working until 3:30 I was
18 working until 5:30, yes; two hours overtime.

19      Q.      So you were working an extra six hours
20 a week?

21      A.      Yeah, four to six.

22      Q.      And what about the Saturdays, were you
23 also covering more Saturdays because Mr. Ameen

1    company?

2    A.    I would if they were told -- I was told
3    that they were cheating on their timecard, I would.
4    No, I never had that occurrence before.  It never
5    came up.

6    Q.    Have you ever had any subordinate
7    employees take extra time beyond their allotted
8    break times?

9    A.    Only when asked.  They have to elevate
10   to the supervisor saying I'm going to need an extra
11   15 minutes for break, an extra half-hour for lunch,
12   or whatever.  But, yes, you can ask your supervisor
13   for more time.

14   Q.    Did you ever have to speak to any of
15   your subordinate employees about your belief that
16   they were taking too long for a break?

17   A.    I've spoken to a couple of my employees
18   that they were taking extended breaks.

19   Q.    Who were they?

20   A.    Ray Garrity, Wayne Emon, Frank Brown.
21   If they came back five minutes late from break, I
22   would let them know that they were five minutes
23   late from break and it should not be a repetitive

```
 1    thing.
 2         Q.     And do Ray Garrity, Wayne Emon and
 3    Frank Brown still work there?
 4         A.     Yes, they work for me.
 5         Q.     And how many different times did you
 6    have to talk to them about taking excess break
 7    time?
 8         A.     Once, so far.
 9         Q.     When was that?
10         A.     It was about a couple of months ago Ray
11    came back late.  It was actually three different
12    occurrences because it didn't all happen on one
13    day.  Ray came back late one day, I spoke to him
14    about it.  Frank came back another day, I spoke to
15    him about it.  So if they don't come back in their
16    15 minute time, I talk to them about it.
17         Q.     And what was their response when you
18    talked to them about it?
19         A.     It won't happen again.
20         Q.     And have you been monitoring it?
21         A.     Yup.  If they're out of -- for break
22    more than their allotted time, I will bring it up
23    to their attention, and if it happens repetitively,
```

1   I will elevate that to the supervisor.

2       Q.   To Mr. Cutter?

3       A.   Correct.

4            MS. BURNS:  Nothing further.  Thank

5   you.

6            MS. BROWN:  If we could just have a

7   couple of minutes to confer, we may have a couple

8   of questions for Mr. Connors.

9            (Recess taken.)

10           MS. BROWN:  Just a couple of quick

11  questions for Mr. Connors.

12                  EXAMINATION

13  BY MS. BROWN:

14      Q.   Mr. Connors, you testified that you

15  observed Mr. Ameen on his cellphone.  Did you have

16  any indication as to who he was talking to?

17      A.   Well, a couple of times he told me he

18  was talking to his brother.

19      Q.   And was there any other indication that

20  you had that he was talking to his brother?

21      A.   Well, I didn't think he was talking to

22  Joe Silva, because he wasn't speaking English.  He

23  was speaking, I assume, his native tongue.