UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Murad Y. Ameen

    v.                                    Civil No. 12-cv-365-LM
                                               Opinion No. 2013 DNH 177

Amphenol Printed Circuits, Inc.


**O R D E R**

Murad Y. Ameen has sued his former employer, Amphenol Printed Circuits, Inc. ("Amphenol"), claiming that Amphenol discharged him in violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-2654. Before the court is Amphenol's motion for summary judgment. Ameen objects. The court heard oral argument on December 11, 2013. For the reasons that follow, Amphenol's motion for summary judgment is granted.


**Summary Judgment Standard**

"Summary judgment is warranted where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" McGair v. Am. Bankers Ins. Co. of Fla., 693 F.3d 94, 99 (1st Cir. 2012) (quoting Fed. R. Civ. P. 56(a); citing Rosciti v. Ins. Co. of Penn., 659 F.3d 92, 96 (1st Cir. 2011). "In determining whether a genuine issue of material fact exists, [the court] construe[s] the evidence in

the light most favorable to the non-moving party and make[s] all reasonable inferences in that party's favor." Markel Am. Ins. Co. v. Díaz-Santiago, 674 F.3d 21, 30 (1st Cir. 2011) (citing Flowers v. Fiore, 359 F.3d 24, 29 (1st Cir. 2004)). "The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila v. Corp. de P.R. para la Diffusión Púb., 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)). "[T]he court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted). "The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012) (quoting Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)).

**Background**

The facts recited in this section are undisputed. At all times relevant to this matter, Ameen was employed by Amphenol. From September of 2008 until his discharge on June 27, 2012, he held the position of second-shift drill-department group leader.

Under the heading "Duties / Responsibilities / Essential Functions," Amphenol's job description for department leaders such as Ameen lists, among other things: "Assists in planning overtime staffing of the department to support output requirements."  Def.'s Mem. of Law, Ex. 7 (doc. no. 31-10), at 2.  Under the heading "Education / Training / Skills / Experience Required," the job description lists, among other things: "Ability to work overtime."  Id.  As the second-shift drill-department group leader, Ameen reported to Joseph Silva.  Silva reported to Raymond Pratt (Operations Manager, Production Manager), and Pratt reported to Christine Harrington (Operations Director).

In anticipation of the birth of his second child, Ameen requested a leave under the FMLA, running from March 12 to March 26, 2012.  Ameen's request was approved, as was a request for an extension.  As a result, it appears that Ameen did not work at all during the week of March 12, worked half time during the weeks of March 19 and 26, and returned to full-time work on April 2.

Two days later, Ameen requested three and one half weeks of extended personal leave, from April 26 to May 21, to travel to Iraq to attend to various personal matters.  The next day, Ameen met with Silva, Pratt, and Amphenol's director of human resources, Valerie Hartlen, to discuss his request for leave.

3

Ameen's deposition includes the following testimony concerning that meeting:

> Q. Okay. And during that meeting, you said that you would help out with the overtime ---
>
> **A. I said I'll try.**
>
> Q. --- when you --- let me just finish the question. Okay?
>
> **A. Yes.**
>
> Q. You said that you would help out with the overtime when you came back from this month-long personal leave; isn't that correct?
>
> **A. Yes.**

Def.'s Mem. of Law, Ex. 1, Ameen Dep. (doc. no. 31-4) 150:13-22 (boldface in the original). After Ameen returned from his personal leave on May 21, he declined several requests that he work overtime, citing his need to care for his wife, who was suffering from high blood pressure, and his newborn child.

On June 27, 2012, Amphenol terminated Ameen's employment. The decision to discharge him was made by Harrington. In a company statement, Amphenol explained Harrington's decision to discharge Ameen this way:

> It was brought to APC's [i.e., Amphenol's] attention on 6/22 that on a regular basis, Murad Ameen leaves the drill department for extended periods during his regular assigned work hours. It was also noted that Murad is on his cell phone throughout the shift. On Friday 6/22, APC reviewed the door access report for the month of June . . . . This data showed that Murad, on a daily basis, punches out of ADI [the system that Amphenol uses to monitor the amount of

4

> time worked by its hourly employees] for his allowed lunch period at approximately 5:40 pm and back in approximately 30 minutes later as allowed in the APC standard policies. However, it was discovered that Murad was then leaving the building approximately 30 to 60 minutes later for an entire 1 hour period. Upon this discovery APC found that this behavior has been consistent and on-going since 2010.
>
> Based on this information Murad has been in violation of the company lunch and break policy which allows for one 15 minute paid break and one 1/2 hour unpaid lunch period. 1) Murad has been in actuality taking [a] 1/2 hour paid break and a 1/2 hour unpaid lunch which is not policy, [and] not approved by any APC management. It is estimated that this has cost APC 1.25 hours of labor per week. At the rate of $17.119 per hour it equates to $1,17.35/year. Murad is in violation of timecard procedures and has been falsifying his timecard for 2 years by wanding out for lunch and then working in the area and leaving the facility at a later time. 2) Although it was approved to combine his 1/2 hour unpaid lunch time and 15 minute paid break at the supervisory level this is not an acceptable practice. It was not approved through Sr. Management as a policy deviation.
>
> This is not Murad's first violation of company procedures or policies and [he] was, within the last 6 months, given a written warning for not following documented procedures in the drill department. As a group leader and APC employee Murad's inability to follow procedures is behavior that cannot be tolerated in the business.

Def.'s Mem. of Law, Ex. 25 (doc. no. 31-28), at 2.

The events leading up to Ameen's discharge are as follows. On June 22, 2012, Paul Connors, Amphenol's first-shift drill-department group leader, told Pratt that Ameen had been seen leaving the building during work hours for an hour at a time. Pratt then asked Hartlen to gather data on Ameen for the month

5

of June from the two separate systems that track the amount of time for which employees are paid (the payroll system) and the amount of time they are in the building (the building system).

The data Hartlen collected demonstrated that Ameen had been: (1) clocking out of the payroll system for about thirty minutes each day while remaining clocked in on the building system and, presumably, continuing to work; (2) clocking back into the payroll system; (3) subsequently clocking out of the building system and leaving the building for approximately one hour while remaining clocked in on the payroll system. Because Ameen was allowed a thirty-minute unpaid lunch break and a fifteen-minute paid break each day, his absence from the building for one hour resulted in his being paid, on a daily basis, for approximately fifteen more minutes than he actually worked. Ameen had permission to combine his thirty-minute unpaid break with his fifteen-minute paid break to create a forty-five minute block, and also had permission to turn that forty-five minute block into a sixty-minute lunch break, if he made up the extra fifteen minutes at the beginning or the end of his shift. Regarding his obligation to make up that time, as opposed to making up the work, Ameen provided the following deposition testimony:

> Q. He said you could combine your lunch and break?
>
> A. **Combine and take more time on top of that, to make it up when you work, come in early, stay late.**
>
> Q. Did you ask him to take more time than your allotted break time?
>
> A. **Yes. And make it up, <u>the time</u>. I was coming early, working overtime, staying late sometimes.**

Def.'s Mem. of Law, Ex. 1, Ameen Dep. (doc. no. 31-4) 67:6-12 (boldface in the original, underlining added). Notwithstanding Ameen's agreement to make up the extra fifteen minutes he took each day for his off-site lunch, the undisputed facts demonstrate that for about two years, Ameen had not been making up that time.

After Pratt reviewed Ameen's time records for June, he reported his findings to Harrington, who asked him to investigate further. On June 26, Pratt observed Ameen leaving the building for an extended lunch break, and then examined the payroll system and building system records to confirm what he had seen. Pratt reported his observations to Harrington who then had Hartlen examine Ameen's payroll system and building system records for the previous two years. Hartlen's examination demonstrated that Ameen's practice of taking an hour-long lunch break, and being paid for fifteen minutes more than he actually worked, had been going on for at least two years. Based upon those findings, Harrington decided to

discharge Ameen, and had Pratt draft and re-draft the statement quoted above.  It is undisputed that at the time Harrington decided to discharge Ameen, she "was unaware of Mr. Ameen's FMLA leave."  Pl.'s Mem. of Law (doc. no. 34-1) 9.

This action followed.  In it, Ameen claims that notwithstanding Amphenol's explanation for discharging him, it actually terminated his employment for taking his formal FMLA leave and/or declining to work overtime so that he could care for his wife and newborn child which, in his view, was conduct protected by the FMLA.

## Discussion

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter . . . [or] [i]n order to care for the spouse . . . of the employee, if such spouse . . . has a serious health condition."  29 U.S.C. § 2612(a)(1)(A) & (C).  Moreover, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided by [the FMLA]," 29 U.S.C. § 2615(a)(1), and it is also "unlawful for any employer to discharge or in any other manner discriminate against any

8

individual for opposing any practice made unlawful by [the FMLA]," 29 U.S.C. § 2615(a)(2).

In this circuit, the interference provision, § 2615(a)(1), encompasses claims such as Ameen's claim that Amphenol retaliated against him for taking FMLA leave. See Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 331-32 (1st Cir. 2005). As the court of appeals has explained:

> The Act . . . prohibits employers from retaliating against employees for exercising their statutory rights. See 29 U.S.C. § 2615(a). Thus, an employer cannot regard the taking of FMLA leave as a negative factor in deciding to terminate an employee. See 29 C.F.R. § 825.220(c); Mellen v. Trustees of Boston Univ., 504 F.3d 21, 26-27 (1st Cir. 2007). But, although an employee who properly takes FMLA leave cannot be discharged for exercising a right provided by the statute, [he] nevertheless can be discharged for independent reasons. Nagle v. Acton-Boxborough Reg'l Sch. Dist., 576 F.3d 1, 3 (1st Cir. 2009).

Henry v. United Bank, 686 F.3d 50, 55 (1st Cir. 2012). "[A] crucial component of an FMLA retaliation claim is some animus or retaliatory motive on the part of the plaintiff's employer that is connected to protected conduct." Pagán-Colón v. Walgreens of San Patricio, Inc., 697 F.3d 1, 8 (1st Cir. 2012) (citing Colburn, 429 F.3d at 335; Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 160 (1st Cir. 1998)).

The court of appeals has also recently delineated the elements of an FMLA retaliation claim:

> "To make out a prima facie case of retaliation [a plaintiff] must show (1) he availed himself of a

9

> protected right under the FMLA; (2) he was adversely affected by an employment decision; (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." [Hodgens, 144 F.3d] at 161 (applying the standard from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to FMLA cases).

McArdle v. Town of Dracut/Dracut Pub. Schs., 732 F.3d 29, 35 (1st Cir. 2013) (parallel citations omitted). Under the McDonnell Douglas burden-shifting framework mentioned in McArdle,

> a plaintiff employee must carry the initial burden of coming forward with sufficient evidence to establish a prima facie case of . . . retaliation. If he does so, then the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's [termination]" . . . . If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected FMLA leave.

Pagán-Colón, 697 F.3d at 9 (quoting Hodgens, 144 F.3d at 160-61; citing McDonnell Douglas, 411 U.S. at 802).

Here, Amphenol argues that it is entitled to summary judgment because: (1) Ameen has failed to establish a prima facie case; (2) it has produced evidence of a legitimate nondiscriminatory reason for discharging Ameen; and (3) Ameen has failed to produce evidence from which a reasonable jury could conclude that the decision to discharge him was tainted by retaliatory animus or that Amphenol's reason for discharging him

was a pretext for unlawful retaliation.  Ameen does not argue that Amphenol has failed to carry its burden at the second stage of the McDonnell Douglas framework, but disagrees, categorically, with Amphenol's arguments in favor of summary judgment.  Amphenol's argument concerning the lack of retaliatory animus attributable to the decisionmaker is persuasive and dispositive.

   Turning to the first stage of the McDonnell Douglas framework, "[t]he prima facie burden is 'quite easy to meet.'" Hodgens, 144 F.3d at 165 (quoting Villanueva v. Wellesley Coll., 930 F.2d 124, 127 (1st Cir. 1991); citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).  The court assumes that Ameen has carried that light burden and further assumes, without deciding, that Ameen's protected conduct included both the formal FMLA leave he took in March of 2012, and his refusal to work overtime after he returned from personal leave in late May.[1]  There is no dispute that Amphenol has produced a legitimate nondiscriminatory reason for discharging Ameen.  Thus, "any presumption of retaliatory animus created by the prima facie case [has] evaporate[d]."  Henry, 686 F.3d at 56 (citing Hodgens, 144 F.3d at 160; Reeves v. Sanderson Plumbing

---

[1] There is a colorable argument that Ameen's refusal to work overtime after his return from personal leave was not conduct protected by the FMLA, but because Amphenol is entitled to summary judgment on other grounds, there is no need to resolve this complicated legal issue.

Prods., Inc., 530 U.S. 133, 142-43 (2000)). Accordingly, at stage three of the McDonnell Douglas framework, "to survive summary judgment, [Ameen]'s burden is to demonstrate, without the benefit of the animus presumption, a trialworthy issue on whether [Amphenol's] stated reason [for discharging him] was but a pretext for retaliating against [him] for having taken protected FMLA leave." Henry, 686 F.3d at 56 (citations omitted).

There is, however, a predicate issue: imputation of retaliatory animus to the decisionmaker. To prove that he or she was subjected to an adverse employment action in retaliation for engaging in protected activity, "the employee must show that the retaliator knew about [his] protected activity – after all, one cannot have been motivated to retaliate by something [she] was unaware of." Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013) (citing Lewis v. Gillette, Co., 22 F.3d 22, 24-25 (1st Cir. 1994); Alvarado v. Donahoe, 687 F.3d 453, 458-59 (1st Cir. 2012)). Here, it is undisputed that Harrington, the Operations Director who made the decision to discharge Ameen, did not know that Ameen had ever taken FMLA leave. Ordinarily, that would be fatal to Ameen's claim. Ameen attempts to overcome that problem by invoking the so-called cat's paw theory of liability to impute the retaliatory animus of Connors and Pratt to Harrington. That attempt, however, is unavailing.

Under the cat's paw theory, which appears to have been first adopted by the court of appeals for this circuit in Cariglia v. Hertz Equipment Rental Corp., 363 F.3d 77 (1st Cir. 2004), a decisionmaker without the requisite knowledge to retaliate may, under certain circumstances, be charged with the retaliatory animus of a subordinate who is also the supervisor of an employee who is adversely affected by an employment action meted out by the decisionmaker.  As Ameen's supervisor's superior, Pratt fits comfortably within the cat's paw rubric. Because Connors was Ameen's peer rather than his superior, it is not at all clear that he fits within the rubric but, for the purpose of ruling on Amphenol's summary-judgment motion, the court will assume, without deciding, that Connors' retaliatory animus, if any, could also be imputed to Harrington.

In Cariglia, which involved a claim brought under the Massachusetts law against age discrimination, Mass. Gen. L. ch. 151B, the court of appeals framed the question before it this way: "whether corporate liability can attach if neutral decisionmakers [such as Harrington], when deciding to terminate an employee, rely on information that is inaccurate, misleading, or incomplete because of another employee's discriminatory animus."  363 F.3d at 83.

In answering that question in the affirmative, the court cited with approval several decisions from other circuits:

13

The District of Columbia Circuit Court of Appeals ruled that "[a]n unfavorable employment decision resulting from <u>inaccurate</u>, discriminatorily-motivated evaluations by the employee's supervisors violates Title VII," even though the decisionmaker was completely free of animus. Stoller v. Marsh, 682 F.2d 971, 972 (D.C. Cir. 1982). "When a supervisor . . . deliberately places an <u>inaccurate</u>, discriminatory evaluation into an employee's file, he intends to cause harm to the employee. . . . [T]he employer – that is, the organization as a whole – cannot escape Title VII liability simply because the final decisionmaker was not personally motivated by discrimination." Id. at 977. . . .

The Seventh Circuit has held that "[a]n employer cannot escape responsibility for wilful discrimination by multiple layers of paper review, when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of older workers." Gusman v. Unisys Corp., 986 F.2d 1146, 1147 (7th Cir. 1993). More recently, the same court held that

> [t]here is only one situation in which the prejudices of an employee . . . are imputed to the employee who has formal authority of the plaintiff's job. That is where the subordinate, by <u>concealing relevant information from the decisionmaking employee or feeding false information to him</u>, is able to influence the decision. In such a case, the discriminatory motive of the other employee, not the autonomous judgment of the nondiscriminating decision-maker, is the real cause of the adverse employment action.

Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1400 (7th Cir. 1997) (citations omitted). See also Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1057 (8th Cir. 1993); Stacks v. Southwestern Bell Yellow Pages, 27 F.3d 1316, 1323 (8th Cir. 1994).

Cariglia, 363 F.3d at 85-86 (emphasis added).

14

In reliance upon the out-of-circuit authority it cited, the Cariglia court vacated the trial court's grant of summary judgment to the employer and remanded the case, instructing the trial court to determine whether the decisionmaker's subordinates, who allegedly bore discriminatory animus, deliberately withheld information from the decisionmaker that would have undermined the reason the decisionmaker gave for discharging the plaintiff.  See id. at 87.  As the court explained: "If the court so finds, then, as in Wallace, 'the subordinate . . . by concealing relevant information from the decisionmaking employee[s] or feeding false information to [them], is able to influence the decision' [which] makes the subordinate's animus 'probative in an employment discrimination case.'"  Id. (quoting Wallace, 103 F.3d at 1400; Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1st Cir. 1990)).

There is, however, a significant problem with Ameen's reliance upon Cariglia.  In Cariglia, the evidence before the trial court may have supported a finding that an animus-bearing subordinate either fabricated evidence against the plaintiff or concealed evidence favorable to the plaintiff from the decisionmaker.  Here, however, Ameen does not even suggest any such malfeasance.  Rather, it is undisputed that: (1) Connors accurately reported Ameen's comings and goings from the Amphenol facility to Pratt; (2) Pratt accurately reported to Harrington

15

both the information he asked Hartlen to collect and the results of the further investigation Harrington asked him to perform. Moreover, Ameen has produced no evidence that the accurate information Connors and Pratt passed along was somehow misleading because they withheld or concealed other information. Finally, it is undisputed that for at least two years, Ameen engaged in precisely the conduct for which he was discharged: punching in and out of the building system and the payroll system in a way that resulted in his being paid for about fifteen minutes per day more than he actually worked.

Ameen counters by arguing that the malfeasance requirement established in Cariglia was effectively abrogated by the United States Supreme Court's decision in Staub v. Proctor Hospital, 131 S. Ct. 1186 (2011). Ameen reads too much into Staub.

Most importantly, the Staub court was not called upon to decide, and did not decide, whether the cat's paw theory applies when the information provided by the subordinate to the decisionmaker is entirely accurate, as is the case here. Moreover, in Staub, the plaintiff produced evidence that the subordinate whose animus he sought to impute to the decisionmaker had, in fact, provided the decionmaker with false evidence against him. See id. at 1189. That, in turn, undermines Ameen's argument that Staub somehow vitiated the malfeasance requirement established by the First Circuit in

Cariglia.  Finally, the court notes that while an employee may not immunize himself from being discharged for reasons unrelated to the FMLA simply by taking leave under that statute, see Henry, 686 F.3d at 55, an employer's ability to discharge an employee for reasons unrelated to conduct protected by the FMLA would be significantly constrained by a rule that would allow accurate reporting of employee misconduct unrelated to the FMLA to count as evidence of retaliatory animus.  In sum, there is nothing in Staub that calls into question the vitality of the malfeasance rule established in Cariglia.  Thus, because Ameen has produced no evidence of any malfeasance by Connors or Pratt when they reported his conduct, the cat's paw theory is unavailable to him.

But, even if that theory were available as a mechanism for imputing animus to Harrington, it is not at all clear that there is any retaliatory animus to impute.  In Staub, the Court's central holding was

> that if a supervisor performs an act motivated by
> antimilitary animus that is intended by the supervisor
> to cause an adverse employment action, and if that act
> is a proximate cause of the ultimate employment
> action, then the employer is liable under USERRA.

131 S. Ct. at 1194 (emphasis in the original, footnote omitted).  In Staub, the evidence of antimilitary animus included this:

17

> Both Janice Mulally, Staub's immediate supervisor, and Michael Korenchuk, Mulally's supervisor, were hostile to Staub's military obligations. Mulally scheduled Staub for additional shifts without notice so that he would "'pa[y] back the department for everyone else having to bend over backwards to cover [his] schedule for the Reserves.'" 560 F.3d 647, 652 (C.A.7 2009). She also informed Staub's co-worker, Leslie Sweborg, that Staub's "'military duty had been a strain on th[e] department,'" and asked Sweborg to help her "'get rid of him.'" Ibid. Korenchuk referred to Staub's military obligations as "'a b[u]nch of smoking and joking and [a] waste of taxpayers['] money.'" Ibid. He was also aware that Mulally was "'out to get'" Staub. Ibid.

131 S. Ct. at 1189. Similarly, in Cariglia, evidence of retaliatory animus included evidence that the supervisor

> ordered an audit . . . "motivated not by sound business reasons, but by a desire on the part of [the supervisor] to 'get the goods' on [the plaintiff] because [the supervisor] believed [the plaintiff] was 'over the hill', 'not our kind' and 'should not be here.'"

363 F.3d at 80 (emphasis added). Here, by contrast, Ameen has produced no evidence that either Connors or Pratt were out to get him fired. To be sure, he has produced evidence that both men may have been unhappy about the difficulties that were created by Ameen's refusal to work overtime after his return from personal leave, but even with all reasonable inferences drawn in Ameen's favor, there is insufficient evidence from which a reasonable jury could conclude that either Connors or

18

Pratt made their reports up the chain of command with the intent of getting Ameen fired.[2]

The bottom line is this.  It is undisputed that Harrington did not know about either Ameen's formal FMLA leave or his practice of declining to work overtime so he could care for his wife and child.  So, absent a successful invocation of the cat's paw theory, Harrington could not have discharged Ameen in retaliation for his exercising his rights under the FMLA.  But, because Ameen has produced no facts from which a reasonable jury could conclude that either Connors or Pratt acted in a way that would justify invocation of the cat's paw theory, Ameen's FMLA claim fails as a matter of law.  In turn, because there is no retaliatory animus to cover up in the first instance, it is unnecessary to even consider the third stage in the McDonnell Douglas framework and determine whether the explanation Harrington gave for Ameen's discharge was pretextual.  That is, even if Ameen could establish that Harrington's explanation was a pretext, which seems highly unlikely, it could not have been a

---

[2] Moreover, if Ameen were able to establish that Amphenol had a "usual practice of allowing employees to take extra break time without discipline," Pl.'s Mem. of Law (doc. no. 34-1) 23, which is part of his disparate treatment argument, that would undercut any claim that Connors or Pratt intended to get Ameen fired by reporting his improper use of break time.  If Amphenol's "usual practice" was to let improper use of break time pass without discipline, it is difficult to see how Connors or Pratt could have believed that their reports on Ameen could have resulted in his discharge.

pretext for unlawful retaliation under the FMLA. In sum, Amphenol is entitled to judgment as a matter of law on Ameen's FMLA claim.

## Conclusion

For the reasons detailed above, Amphenol's motion for summary judgment, document no. 31, is granted. The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

December 23, 2013

cc: Jennifer C. Brown, Esq.
    Heather M. Burns, Esq.
    Lauren S. Irwin, Esq.
    Jonathan D. Rosenfeld, Esq.
    Mary E. Tenn, Esq.